1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*E-FILED - 9/30/10*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PAUL D. O'HAIRE, | No. C 07-0002 RMW (PR) |
| Plaintiff, | ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; REFERRING TO PRO SE PRISONER SETTLEMENT PROGRAM |
| v. | |
| NAPA STATE HOSPITAL, et al., | |
| Defendants. | (Docket No. 107, 126) |

Plaintiff filed a pro se civil rights action pursuant to 42 U.S.C. § 1983 against employees of Napa State Hospital ("NSH").  On December 9, 2009, NSH defendants moved for summary judgment.  After being granted two extensions of time in which to file his opposition, plaintiff filed an opposition to defendants' motion for summary judgment on March 8, 2010.  Although the court granted defendants' an extension of time in which to file a reply, defendants failed to file a reply.  Having carefully considered the papers submitted, the court hereby GRANTS IN PART and DENIES IN PART defendants' motions for summary judgment for the reasons set forth below.

**BACKGROUND**

On March 31, 1999, plaintiff was adjudicated not guilty by reason of insanity ("NGRI")

1   in a criminal trial by the Alameda County Superior Court and civilly committed for a life term.

2   (Decl. Bleman at ¶ 8.)  On August 26, 1999, plaintiff was transferred from Patton State Hospital

3   to NSH.  (Id.)  At NSH, plaintiff was initially diagnosed as having a delusional disorder.  (Id. at ¶

4   9.)  His previous history includes four episodes of kidnapping and, in 1976, he suffered a two-

5   year commitment to Atascadero State Hospital and NSH pursuant to an NGRI finding.  (Id.)

6                                             **ANALYSIS**

7           Plaintiff claims that defendants: (1) violated his right to due process by failing to provide

8   adequate medical care; (2) were deliberately indifferent to his serious medical needs; (3) violated

9   the Equal Protection Clause by discriminating against homosexuals; and (4) retaliated against

10  him.  Defendants move for summary judgment, arguing that they are entitled to judgment as a

11  matter of law because there are no genuine issue of material facts in dispute.[1]

12  I.      Standard of Review

13          Summary judgment is proper where the pleadings, discovery and affidavits demonstrate

14  that there is "no genuine issue as to any material fact and that the moving party is entitled to

15  judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Material facts are those which may affect

16  the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute

17  as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a

18  verdict for the nonmoving party.  Id.

19          The party moving for summary judgment bears the initial burden of identifying those

20  portions of the pleadings, discovery and affidavits which demonstrate the absence of a genuine

21  issue of material fact.  Celotex Corp. v. Cattrett, 477 U.S. 317, 323 (1986).  Where the moving

22  party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no

23  

24  _____

25          [1] Defendants also argue that because plaintiff seeks damages from defendants, plaintiff
    was required, but failed, to file a timely claim under the California Tort Claims Act ("CTCA").

26  (MSJ at 23.)  However, the CTCA is inapplicable to plaintiff's claims.  See Hai T. Le v. Hilton
    Hotel, 2010 WL 144809, *9 n.9 (N.D. Cal. 2010) ("The California Tort Claims Act does not

27  apply to federal constitutional claims under 42 U.S.C. § 1983."); Butler v. Los Angeles County,
    617 F. Supp. 2d 994, 1001 (C.D. Cal. 2008) (same); Williams v. Horvath, 16 Cal. 3d 834, 842

28  (1976) (same).

1    reasonable trier of fact could find other than for the moving party.  But on an issue for which the

2    opposing party will have the burden of proof at trial, the moving party need only point out "that

3    there is an absence of evidence to support the nonmoving party's case."  Id. at 325.

4         Once the moving party meets its initial burden, the nonmoving party must go beyond the

5    pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a

6    genuine issue for trial."  Fed. R. Civ. P. 56(e).  The court is only concerned with disputes over

7    material facts and "factual disputes that are irrelevant or unnecessary will not be counted."

8    Anderson, 477 U.S. at 248.  It is not the task of the court to scour the record in search of a

9    genuine issue of triable fact.  Keenan v. Allen, 91 F.3d 1275, 1279 (9th Cir. 1996).  The

10   nonmoving party has the burden of identifying, with reasonable particularity, the evidence that

11   precludes summary judgment.  Id.  If the nonmoving party fails to make this showing, "the

12   moving party is entitled to judgment as a matter of law."  Celotex Corp., 477 U.S. at 323.

13   II.    Plaintiff's Claims

14          A.    Inadequate Medical Care / Due Process[2]

15                1.    Factual background

16        Plaintiff was placed in Unit T-8 at NSH and treated by defendant Yasaie for a period of

17   18 months.  (Complaint at ¶ 10.).  At some point, Yasaie formed a sex offender therapy group

18   and created three men's groups consisting of eight patients per group.  (Id.)  After attending

19   these group meetings plaintiff realized that he "needed" this treatment and accepted that he did

20   indeed have a mental illness.  (Id.)  Yasaie repeatedly noted the need to obtain plaintiff's prior

21   records concerning his prior psychotic episodes.  (Id. at 23.)

22        In February 2001, plaintiff was transferred from T-8 to an "Open Unit," T-15.  (Id. at

23

24   _____

25        [2]  Because plaintiff is not a prisoner, the Eighth Amendment is not the proper vehicle for
     him to challenge the conditions of his civil confinement.  Cf. Hydrick v. Hunter, 500 F.3d 978,
26   983 (9th Cir. 2007) (discussing constitutional rights of those civilly committed under the
     Sexually Violent Predators Act), vacated on other grounds, 129 S. Ct. 2431 (2009).  However,
27   the same claims for inhumane treatment and failure to protect may be raised under the
     Fourteenth Amendment.  Id.  The standard applicable under the Fourteenth Amendment is at
28   least coextensive with that applicable to prisoners under the Eighth Amendment.  Id.

¶ 14; Decl. Bleman at ¶ 10.)  T-15 is designated a "Fast Track Unit," typically used for patients who will be discharged to a Community Out Patient Treatment Program within 18 months. (Complaint at ¶ 13.)  T-15 specializes in the treatment of sex offenders, and is comprised of all-male patients.  (Decl. Bleman at ¶ 10.)  On February 20, 2001, plaintiff asked defendant Kaur if he could continue to attend the men's group he had been attending while at T-8 and Kaur stated that he would consider it. (Complaint at ¶ 26.)  Plaintiff had also asked Yasaie if he could continue attending the group, and while Yasaie replied that he would think about it, nothing occurred.  (Id. at 25.)  Once plaintiff moved to T-15 and stopped attending the men's group, he no longer received need-specific treatment.  (Opp. at 27.)

On May 17, 2001, plaintiff's Treatment Team submitted a referral for plaintiff to receive one-on-one individual therapy to address the severity of plaintiff's prior psychotic episodes and other need-specific issues that required further examination.  (Complaint at ¶ 30.)  Because there was a shortage of medical staff, plaintiff was assigned Ron Shaw, P.S.W., for 50-minute weekly sessions.  (Id.)  However, at some point, Shaw sustained a work-related injury and, due to budgetary constraints, plaintiff stopped receiving any one-on-one therapy sessions.  (Id.)

On October 23, 2001, Drs. Schultz and White, co-facilitators of a Phase II sex offender group interviewed plaintiff for potential placement within his group via a referral from plaintiff's Treatment Team.  (Id. at ¶ 31.)  Dr. Schultz concluded that plaintiff was not a good candidate for the group but recommended that he be referred to "Risk Assessment" to focus on plaintiff's sexual issues.  From November 28, 2001 through November 20, 2002, plaintiff attended several weekly group therapy sessions consisting of a core therapy group and an art therapy group but no consistent need-specific therapy.  (Id. at ¶¶ 33, 42.)

From February 2001 through August 12, 2002, plaintiff states that he only met with his senior care provider, Kaur, for a total of approximately 6-10 hours.  (Id. at 35.)  Plaintiff also rarely saw Yasaie, another member of his Treatment Team.  (Id.)  While at T-15, plaintiff states that he was uncertain as to what his Axis I and Axis II disorders were, he was uncertain whether his crimes had a sexual component to them because he was not receiving any feedback from

1  defendants, and there was no longer any need-specific therapy to address his "homoerotic

2  obsession." (Id. at 28.)

3       In February 2002, Yasaie was transferred into T-15 and became a member of plaintiff's

4  Treatment Team. (Id. at ¶ 32.) Plaintiff again requested that he start a men's group in T-15

5  similar to the one he formed while at T-8 in order to address his specific needs. (Id.) Although

6  Yasaie said that he would consider it, he never formed such a group. (Id.)

7       On August 12, 2002, the Conditional Release Program declined to accept plaintiff

8  because he needed further testing and there was concern about the violent nature of plaintiff's

9  prior psychotic episodes. (Id. at 15.) Plaintiff realized that defendants had not addressed any of

10 the treatment issues which had been identified prior to his transfer to T-15. (Id. at 40.) In

11 December 2002, Dr. Robin F. Lin, an Assistant Clinical Professor Psychiatry at UC Davis,

12 created a report that stated plaintiff posed a moderate risk of re-offense. (Id. at ¶ 16; Decl.

13 Bleman at ¶ 15.) Dr. Lin stated that a review of the records regarding each of plaintiff's prior

14 psychotic episodes were necessary to better understand plaintiff's issues and recommended that

15 plaintiff's medications be discontinued to ensure that he remain symptom-free. (Complaint at ¶

16 16.) Dr. Lin rejected plaintiff's diagnosis that he suffered from a delusional disorder and

17 concluded that plaintiff's illness may have a sexual component to it. (Id. at ¶ 16; Decl. Bleman

18 at ¶ 15.)

19      In 2003, plaintiff consistently complained about the increasing rate of group therapy

20 cancellations. (Complaint at ¶ 73.) He observed that his Treatment Team rushed through their

21 conference meetings, failed to discuss his behaviors or the analysis of his behaviors with him,

22 and delayed giving him copies of their report. (Id. at ¶¶ 30-33.) Plaintiff further documents

23 increased cancellations of therapy through 2004. (Id. at ¶¶ 135-138.)

24            2.   Discussion

25      Plaintiff asserts that the T-15 "Fast Track Treatment" was illusory. (Complaint at ¶ 40.)

26 He alleges that while housed at T-15, he no longer received any need-specific treatment, nor did

27 defendants address any underlying issues raised as concerns while he was still at T-8. (Id. at ¶

28

1   43.)  During the intermittent times that plaintiff received feedback regarding his treatment, each

2   report noted the same needs, however, no action was being taken.  Plaintiff states he felt like he

3   was being warehoused rather than treated.  As a result, plaintiff believes the course of treatment

4   given to him at T-15 fell below minimum National Health Care Standards and denied him a

5   realistic opportunity at treatment and placement into the least restrictive setting.  (Id.; Opp. at ¶

6   32.)

7          "Persons who have been involuntarily committed are entitled to more considerate

8   treatment and conditions of confinement than criminals whose conditions of confinement are

9   designed to punish."  Youngberg v. Romeo, 457 U.S. 307, 321-22 (1982).  States also must

10  provide civilly-committed persons with access to mental health treatment that gives them a

11  realistic opportunity to be cured and released.  Sharp v. Weston, 233 F.3d 1166, 1172 (9th Cir.

12  2000); cf. Oregon Advocacy Center v. Mink, 322 F.3d 1101, 1121 (9th Cir. 2003) (incapacitated

13  criminal defendants have a liberty interest in receiving restorative treatment and an interest in

14  freedom from incarceration).  To determine whether the nature and extent of an infringement of

15  one of these liberty interests rises to the level of a due process violation, a court must balance the

16  individual's liberty interest against the relevant state interests, as measured by the state's

17  asserted reasons for restraining the individual.  Id. at 320-21.  The court must only make certain

18  that professional judgment in fact was exercised in making the pertinent decision.  Id. at 321-22.

19  "[T]he decision, if made by a professional, is presumptively valid; liability may be imposed only

20  when the decision by the professional is such a substantial departure from accepted professional

21  judgment, practice, or standards as to demonstrate that the person responsible actually did not

22  base the decision on such judgment."  Id. at 323.  Courts undertaking this inquiry are restricted to

23  two questions: "(1) whether the decisionmaker is a qualified professional entitled to deference,

24  and (2) whether the decision reflects a conscious indifference amounting to gross negligence, so

25  as to demonstrate that the decision was not based upon professional judgment."  Houghton v.

26  South, 965 F.2d 1532, 1536 (9th Cir. 1992).

27          Defendants' motion fails to address this claim.  Accordingly, defendants Kaur, Yasaie,

28

Order Granting in Part and Denying in Part Defendants' Motion for Summary Judgment; Referring to Pro Se
Prisoner Settlement Program
P:\PRO-SE\SJ.Rmw\CR.07\Ohaire002msjref.wpd          6

1  Graziani, and Ott have not shown that they are entitled to judgment as a matter of law and the

2  motion for summary judgment is DENIED as to plaintiff's due process claim.

3      B.      Deliberate Indifference to Serious Medical Needs

4          1.      Factual Background

5          After December 2002, consistent with Dr. Lin's risk assessment report, plaintiff's

6  Treatment Team decided to take him off of medication. (Complaint at ¶ 45.)  Prior to this

7  decision, plaintiff was receiving 400 mg of seroquel per day.[3]  (Id. at ¶ 46.)  On February 7,

8  2003, plaintiff's dosage was cut in half.  (Id. at ¶ 47.)  No one informed plaintiff of the potential

9  side-effects of a reduction in his dosage.  (Id. at ¶ 46.)  That night, plaintiff couldn't sleep.  (Id.

10  at 47.)  He went to the nurses' station where they called the Medical Officer on Duty ("MOD"),

11  who ordered 15 mg of Restoril.  (Id.)  The following night, plaintiff again could not sleep so

12  returned to the nurses' station only to receive tylenol.  (Id.)  The third night, plaintiff again went

13  to the nurses' station who called the MOD, who prescribed 15 mg of Restoril.  (Id.)

14          Plaintiff told Kaur about his sleep deprivation and in response, Kaur stated, "I told you, I

15  don't proscribe sleep medication."  (Id.)  From February 11, 2003 through February 17, 2003,

16  plaintiff requested but did not receive any sleep aides.  (Id.)  Plaintiff was only able to get about

17  three hours of sleep per night and became increasingly fatigued.  (Id. at ¶ 48.)  From February

18  18, 2003 through March 4, 2003, plaintiff was able to attain only four hours of sleep per night

19  and felt numb.  (Id. at ¶ 49.)  Kaur reduced plaintiff's seroquel again from 100 mg to 50 mg per

20  night.  (Id. at ¶ 50.)  Plaintiff felt increasingly exhausted and numb.  (Id.)  He asked Kaur again

21  for help, to which Kaur repeated, "I don't prescribe sleep medication."  (Id. at ¶ 51.)

22          On March 21, 2003, plaintiff went to see Dr. Margaret Miller and told her about his

23  insomnia and the fact that sleep deprivation had been a precursor to plaintiff's prior psychotic

24  episodes.  (Id. at ¶ 52.)  Dr. Miller immediately prescribed Restoril for 6 days, to be used "as

25  needed" and warned plaintiff that the drug was addictive  (Id.)  On March 23, 2003, plaintiff

27  [3] Seroquel is an antipsychotic and mood stabilizer drug.  (Decl. Bleman, Attachment 2 at

28  10.)

attempted to get Restoril through his prescription and was told that Kaur discontinued the prescription order as soon as she learned of it.  (Id. at ¶ 54.)

On April 18, 2003, Kaur discontinued any seroquel prescription.  (Id. at ¶ 56.)  Plaintiff suffered severe sleep disruption and total exhaustion.  (Id. at ¶¶ 55-56.)  Kaur responded to plaintiff's later complaints by responding that as people get older, they require less sleep, and by directing plaintiff to stop drinking caffeine after 11:00 a.m.  (Id. at ¶¶ 55, 61; Opp. at ¶ 54.)

As a result of the decrease and ultimate discontinuation of medication, plaintiff suffered severe sleep deprivation, exhaustion, and headaches.  From February 8, 2003 through April 2, 2003, plaintiff complained several times to Yasaie, Weakley, Kaur and unnamed defendants about his severe sleep deprivation and no one attempted to assist him.  (Complaint at ¶ 59.)

2.  Discussion

Deliberate indifference to serious medical needs violates the Eighth Amendment's proscription against cruel and unusual punishment.  See Estelle v. Gamble, 429 U.S. 97, 104 (1976); McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled on other grounds, WMX Technologies, Inc. v. Miller, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc).  A determination of "deliberate indifference" involves an examination of two elements: the seriousness of the prisoner's medical need and the nature of the defendant's response to that need.  See McGuckin, 974 F.2d at 1059.  A "serious" medical need exists if the failure to treat a prisoner's condition could result in "unnecessary and wanton infliction of pain."  McGuckin, 974 F.2d 1059 (citing Estelle, 429 U.S. at 104).  The existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain are examples of indications that a prisoner has a "serious" need for medical treatment.  Id. at 1059-60.

A prison official is deliberately indifferent if he knows that a prisoner faces a substantial risk of serious harm and disregards that risk by failing to take reasonable steps to abate it.  Farmer v. Brennan, 511 U.S. 825, 837 (1994).  The defendant, however, must purposefully

1    ignore or fail to respond to plaintiff's pain or medical needs.  See McGuckin, 974 F.2d at 1060.

2    Plaintiff must allege that, subjectively, defendants had a "sufficiently culpable state of mind"

3    when they refused medical care.  Clement v. Gomez, 298 F.3d 898, 903 (9th Cir. 2002) (quoting

4    Wallis v. Baldwin, 70 F.3d 1074, 1076 (9th Cir. 1995)).  Defendants must "both be aware of the

5    facts from which the inference could be drawn that a substantial risk of serious harm exists, and

6    he must also draw the inference."  Farmer, 511 U.S. at 837.  Thus, an inadvertent failure to

7    provide adequate medical care, mere negligence or medical malpractice, a mere delay in medical

8    care (without more), or a difference of opinion over proper medical treatment, are all insufficient

9    to constitute an Eighth Amendment violation.  See Estelle, 429 U.S. at 105-07.

10       Viewing the evidence in the light most favorable to the plaintiff, there exists genuine

11   issues of material fact as to whether defendants Kaur and Yasaie were deliberately indifferent to

12   plaintiff's sleep deprivation.  Defendants argue that plaintiff's allegations do not rise to the level

13   of an Eighth Amendment violation.  They submit a declaration by Dr. Bleman, plaintiff's current

14   treating psychiatrist.  The declaration, however, concerns plaintiff's treatment and historical

15   diagnosis but does not address plaintiff's deliberate indifference claim that occurred in 2002.

16   Moreover, defendants appear to argue that plaintiff's claims are all a product of his mental

17   illness.  However, at the summary judgment stage, the court may not assess the credibility of the

18   parties.

19       Plaintiff has asserted that he had a serious medical need.  He further elaborated that he

20   complained to Yasaie, Weakley, and Kaur repeatedly and Kaur appeared to purposefully fail to

21   respond to plaintiff's pain while Yasaie appeared to ignore his complaint.  See McGuckin, 974

22   F.2d at 1060, 1062 (recognizing that indifference may appear when prison officials deny, delay

23   or intentionally interfere with medical treatment, or it may be shown in the way in which prison

24   officials provide medical care).  Once these prerequisites are met, it is up to the factfinder to

25   determine whether deliberate indifference was exhibited by the defendants.

26       Although plaintiff names Ott and Graziani as defendants, he does not allege that either

27   defendant knew that a substantial risk of harm existed.  In fact, plaintiff states that someone

28

Order Granting in Part and Denying in Part Defendants' Motion for Summary Judgment; Referring to Pro Se
Prisoner Settlement Program

1   should have alerted Ott about plaintiff's condition.  (Complaint at ¶ 59.)  Thus, plaintiff has

2   failed to proffer enough evidence of a deliberate indifference claims against Ott and Graziani.

3   See Gibson v. County of Washoe, 290 F.3d 1175, 1188 (9th Cir. 2002) (recognizing that a

4   defendant who should have known about a risk of serious harm, but did not, is not liable).

5          Accordingly, defendants' motion for summary judgment is GRANTED as to Ott and

6   Graziani and DENIED as to Yasaie and Kaur.

7          C.      Equal Protection

8                  1.      Factual Background

9          In 2003, a memo was issued throughout NSH addressing the rights of its clients to

10  engage in consensual sex in a healthy and safe location.  (Complaint at ¶ 100.)  Thereafter, the

11  memo was removed from the premises and Weakley stated that severe budgetary constraints

12  prohibited NSH from providing trailers or some other such private area for the practice of

13  consensual sex.  (Id.)  At some unknown time, patients in T-15 were advised by Weakley that

14  any patient who engaged in consensual sex would be sent back to his unit and lose grounds

15  privileges.  (Id. at ¶ 101(e).)

16         Plaintiff complains that NSH provides free condoms and birth control but failed to

17  educate anyone about safe sex practices or providing adequate safeguards.  (Id. at ¶¶ 102-103.)

18  Plaintiff alleges that NSH engages in "bush therapy," which is the equivalent of a "don't ask

19  don't tell" policy for both heterosexual and homosexual individuals.  (Id. at ¶ 101.)  He alleges

20  that at one time, T-15 housed heterosexual couples with children, and the prohibition on

21  consensual sex did not apply to them.  (Id. at ¶ 102(e).)

22                 2.      Discussion

23         The recognized class of "homosexual persons or gays and lesbians" is protected from

24  discrimination by the Equal Protection Clause of the Fourteenth Amendment.  See Romer v.

25  Evans, 517 U.S. 620, 631-36 (1996).  The government may defeat allegations that one was

26  discriminated against on the basis of mere status as a homosexual only if it can establish that the

27  discriminatory regulation, policy or practice bears a rational relation to legitimate governmental

28

Order Granting in Part and Denying in Part Defendants' Motion for Summary Judgment; Referring to Pro Se
Prisoner Settlement Program

1   purposes.  See id. at 633-36 (finding state constitutional amendment prohibiting gays and

2   lesbians from seeking protection of the laws bears no rational basis to legitimate state interests).

3        Under the rational basis standard, a state action will be sustained if it is rationally related

4   to a legitimate governmental purpose.  See City of Cleburne v. Cleburne Living Center, Inc., 473

5   U.S. 432, 440 (1985).  Under this standard, plaintiff will prevail if (1) he is similarly situated to

6   persons who are treated differently by defendants; and (2) defendants have no rational basis for

7   the dissimilar treatment.  More v. Farrier, 984 F.2d 269, 271 (8th Cir. 1993).

8        It is unclear exactly what plaintiff is alleging here.  On the one hand, he appears to claim

9   that NSH defendants have a duty to provide patients with an adequate and safe location to

10  engage in sexual activity.  (Complaint at ¶ 102.)  In addition, plaintiff suggests that while

11  Directive 744 (Decl. Merritt, Ex. A, May 1, 2002 Ad. Dir.) provided for a list of precautions and

12  guidelines to protect the "lesser functioning clients" who can be manipulated into sexual activity,

13  the policy provided no such similar care to provide for proper education and safe sex practices

14  for those who wished to engage in consensual sexual activity.  (Complaint at ¶ 102.)

15       To the extent this is plaintiff's claim, his claim cannot survive summary judgment.  The

16  directive is geared toward providing guidelines for staff regarding "safe sexual behavior of

17  individuals." (Decl. Merritt at ¶ 9.)  Its purpose is to require staff intervention when "necessary

18  to protect against sexually transmitted diseases, unwanted pregnancy, or physically or

19  psychologically injurious behavior" including "use of violence, threats, or intimidation" (id.) and

20  "engaging in unprotected sex" (id. at Ex. A, May 1, 2002 Administrative Directive at 2.).  The

21  directive is not designed to encourage sexual activity in any form, but to prevent unsafe or

22  harmful sexual behaviors.  (Id. at Ex. A, May 1, 2002 Ad. Dir.)  Moreover, even if the policy

23  resulted in disparate treatment alleged by plaintiff, the Administrative Directive policy states it is

24  to "assist each patient to function successfully in society upon the patient's release."  (Id. at 1.)

25  Protecting the "lesser functioning clients" through staff intervention from harmful behaviors is

26  rationally related to achieving that goal by increasing their chances of successful treatment.  Cf.

27  Squaw Valley Development Co. v. Goldberg, 375 F.3d 936, 944 (9th Cir. 2004) (recognizing

28

1    that plaintiff must establish that he "has been intentionally treated differently from others

2    similarly situated and that there is no rational basis for the difference in treatment" in order

3    establish an equal protection claim).

4           Plaintiff also suggests that homosexual patients and heterosexual patients are treated

5    differently.  However, his claim reveals no dates or specific incidents.  In his opposition, he

6    suggests that although the policy is facially neutral, it was practiced in a discriminatory way.

7    (Opp. at ¶¶ 72-73.)  For the first time, plaintiff alleges in his opposition that "bush therapy"

8    among heterosexuals was ignored while the same behaviors in homosexuals resulted in

9    "treatment" consequences.  (Id. at ¶ 67.)  Plaintiff goes on to state that while heterosexual

10   couples would often be seen together on the grounds of the hospital while homosexual couples

11   were never "visible in the light of day" because it was "understood" what the consequences

12   would be.  (Id. at ¶ 75.)  As an example, plaintiff alleges that he and an individual named

13   Stephen Worrell became inseparable and the NSH staff believed they were engaging in sexual

14   activity.  Plaintiff claims that as a result, both plaintiff and Worrell were subject to a "sea of

15   red-ink" in plaintiff's case file and had to engage in numerous Team Meetings.  (Id. at ¶ 76.)

16          Plaintiff fails to demonstrate that defendants treated homosexuals differently from

17   heterosexuals.  First, his allegation that heterosexual "bush therapy" was ignored and

18   homosexual "bush therapy" was "treated," is unsupported by any factual support.  Cf. Thornton

19   v. City of St. Helens, 425 F.3d 1158, 1167 (9th Cir. 2005) ("conclusory statements of bias do not

20   carry the nonmoving party's burden in opposition to a motion for summary judgment").

21   Similarly, that homosexuals were not seen by the light of day because the consequences were

22   "understood" is also unsupported.  See id.  Finally, even assuming that staff assumed plaintiff

23   and Worrell were engaging in sexual activity and staff became concerned, plaintiff does not

24   demonstrate a nexus that this concern was part of some unspoken policy against homosexuality

25   or that plaintiff and Worrell were treated differently from any other potential heterosexual

26   individuals residing in a sex offender unit.

27          Accordingly, defendants' motion for summary judgment on plaintiff's equal protection

28

1    claim is GRANTED.

2        D.    Retaliation

3            1.    Factual Background

4        Plaintiff states that in October and November 2003, he filed Patients' Rights Complaints

5    in an effort to exhaust administrative remedies and all were met with "administrative silence."

6    (Complaint at ¶¶ 105-114.)  Plaintiff attempted to obtain copies of his medical records for

7    purposes of filing a federal civil rights complaint, however, plaintiff believes that defendants

8    delayed the process and made it difficult to get them.  (Id. at ¶¶ 117-119.)

9        On November 18, 2003, Plaintiff requested that Kaur no longer be his doctor because he

10   had filed a civil rights complaint against him and believed it would be a conflict of interest.  (Id.

11   at ¶ 120.)  As a result, Thomas told him three times, "Filing complaints and litigiousness are the

12   first signs of paranoia."  (Id.)  Yasaie and Weakley then informed plaintiff that they had watched

13   him deteriorating into a state of paranoia for the previous nine months.  (Id.)  Plaintiff asserts

14   that at no time was he made aware of this suspicion nor did he receive any records that reflected

15   that concern.  (Id.)  That same day, Thomas told him he would have to be re-medicated.  (Id.)

16   Plaintiff objected.  He met with Weakley and wrote a statement of opposition to re-medication.

17   (Id.)  Then plaintiff met with Thomas who called the Chief of Services and told him that plaintiff

18   was lethargic and litigious and needed to be back on seroquel.  (Id.)

19       On November 20, 2003, Thomas wanted to put plaintiff back on seroquel to relieve

20   plaintiff's sleep deprivation.  (Id. at ¶ 122.)  Plaintiff agreed and the medication appeared to help

21   him sleep better.  Soon thereafter, plaintiff began to suspect that defendants' decision to

22   re-medicate him and label him "paranoid" were the product of his filing complaints.  (Id. at

23   ¶ 122.)  As a result, plaintiff withdrew all complaints and Thomas said that was the first smart

24   thing he had done (id. at ¶ 124), Graziani thanked him for withdrawing complaints (id. at ¶ 125),

25   and Weakley smiled when he told her the same (id. at ¶ 124).

26       On January 22, 2004, plaintiff told Thomas that he was going to file federal complaint

27   because nothing had changed in terms of the quality of treatment at T-15.  (Id. at ¶ 145.)  In that

28

1   same meeting, Thomas suggested it would be necessary to increase plaintiff's seroquin to 50 mg.

2   Plaintiff objected above anything more than what was given to help him sleep.  Nevertheless,

3   plaintiff learned that Thomas ordered an increase of seroquel to 200 mg over his objection.  (Id.)

4                  2.     Discussion

5          A claim may be stated under § 1983 where a plaintiff alleges retaliation by state actors

6   for the exercise of his First Amendment rights.  See Mt. Healthy City Bd. of Educ. v. Doyle, 429

7   U.S. 274, 283-84 (1977). The plaintiff must show that the type of activity he was engaged in was

8   protected by the First Amendment and that the protected conduct was a substantial or motivating

9   factor for the alleged retaliatory acts.  See id. at 287.  Retaliation is not established simply by

10  showing adverse activity by defendant after protected speech; rather, plaintiff must show a nexus

11  between the two.  See Huskey v. City of San Jose, 204 F.3d 893, 899 (9th Cir. 2000) (retaliation

12  claim cannot rest on the logical fallacy of post hoc, ergo propter hoc, i.e., "after this, therefore

13  because of this").  In order to create a genuine issue of material fact on retaliatory motive in the

14  First Amendment context, a plaintiff must establish "in addition to evidence that the defendant

15  knew of the protected speech, at least (1) evidence of proximity in time between the protected

16  speech and the allegedly retaliatory decision; (2) evidence that the defendant expressed

17  opposition to the speech; or (3) evidence that the defendant's preferred reason for the adverse

18  action was pretextual." Corales v. Bennett, 567 F.3d 554, 568 (9th Cir. 2009) (internal citation

19  and emphasis omitted).

20         As a threshold matter, plaintiff has established as a matter of law that his conduct -- the

21  filing of complaints or grievances -- meets the core requirement of the retaliation analysis, that

22  is, that it is constitutionally protected under the First Amendment.  Cf. Cornett v. Donovan, 51

23  F.3d 894, 898 (9th Cir. 1995) ("right of access [to the courts] is guaranteed to people

24  institutionalized in a state mental hospital regardless of whether they are civilly committed after

25  criminal proceedings or civilly committed on grounds of dangerousness"); Rizzo v. Dawson, 778

26  F.2d 527, 531-32 (9th Cir. 1985) (recognizing that punishment in retaliation for exercising a

27  right to access the courts may violate the First Amendment).

28

1    Plaintiff's claim that defendants responded to his patients' rights complaints with

2 "administrative silence" cannot survive summary judgment.  Plaintiff has no cognizable First

3 Amendment claim based on these allegations because the First Amendment right to petition does

4 not grant citizens the right to any particular action in response to a grievance.  See Flick v. Alba,

5 932 F.2d 728, 729 (8th Cir. 1991).  That is, plaintiff cannot demonstrate that the defendants'

6 failure to respond to his many administrative complaints constitutes an adverse action because

7 plaintiff has no constitutional right to a response.

8    However, viewing the evidence in the light most favorable to plaintiff, he has submitted

9 sufficient evidence of essential elements of retaliation for his claim that defendants retaliated

10 against him by labeling him "paranoid" and increasing his medication.  Specifically, plaintiff

11 alleged that defendants Thomas, Yasaie, and Weakley all knew that plaintiff filed a complaint

12 against them and soon thereafter, they began discussing re-medicating him because of his

13 increased "paranoia."  See Corales, 567 F.3d at 568; see, e.g., Soranno's Gasco, Inc. v. Morgan,

14 874 F.2d 1310, 1315-16 (9th Cir. 1989) (evidence of timing and nature of suspensions sufficient

15 to infer retaliatory motive).

16    Plaintiff must also show a causal connection between a defendant's retaliatory animus

17 and subsequent injury in any sort of retaliation action.  Hartman v. Moore, 547 U.S. 250, 259

18 (2006).  The requisite causation must be but-for causation, without which the adverse action

19 would not have been taken; upon a prima facie case of retaliatory harm, the burden shifts to the

20 defendant official to demonstrate that even without the impetus to retaliate he would have taken

21 the action complained of.  Id. at 260.  If there is a finding that retaliation was not the but-for

22 cause of the action complained of, the claim fails for lack of causal connection between

23 unconstitutional motive and resulting harm, despite proof of some retaliatory animus in the

24 official's mind.  Id.  "It may be dishonorable to act with an unconstitutional motive and perhaps

25 in some instances be unlawful, but action colored by some degree of bad motive does not amount

26 to a constitutional tort if that action would have been taken anyway."  Id. (citations omitted).

27    Here, while defendants generally proffer that plaintiff suffers from "severe mental

28

Order Granting in Part and Denying in Part Defendants' Motion for Summary Judgment; Referring to Pro Se
Prisoner Settlement Program

1   disorders" and that plaintiff's retaliation claim is consistent with behaviors associated with his

2   disorders, defendants do not meet their burden of demonstrating that labeling plaintiff

3   "paranoid" and re-medicating him was independently justified on grounds other than retaliation.

4   See Mt. Healthy City Bd. Of Ed. v. Doyle, 429 U.S. 274, 287 (1977).

5           Although plaintiff names Ott and Graziani as defendants, he does not allege that either

6   defendant was personally involved in the alleged violation.  Under no circumstances is there

7   liability under section 1983 solely because one is responsible for the actions or omissions of

8   another.  See Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989).  Thus, plaintiff has failed to

9   proffer enough evidence of a retaliation against Ott and Graziani.

10          Accordingly, defendants' motion for summary judgment on plaintiff's retaliation claim is

11  GRANTED as to Ott and Graziani and DENIED as to Yasaie, Thomas, and Weakley.

12  III.    Qualified Immunity

13          Defendants contend that even if they violated plaintiff's constitutional rights, they are

14  entitled to qualified immunity under Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982), which

15  protects government officials from liability for civil damages if a reasonable person would not

16  have known that the conduct violated a clearly established right.  The burden is on defendants to

17  establish that their actions were reasonable.  Doe v. Petaluma City School Dist., 54 F.3d 1447,

18  1450 (9th Cir. 1995).  As the court has explained above, plaintiff produced sufficient evidence to

19  establish a genuine issue of material fact whether defendants violated his Fourteenth Amendment

20  right to due process, Eighth Amendment right against deliberate indifference to serious medical

21  needs, and First Amendment right against retaliation.

22          First, civilly committed persons have a clearly established liberty interest in "reasonably

23  nonrestrictive confinement conditions."  Youngberg v. Romero, 457 U.S. 307, 324 (1982)

24  (holding that civilly committed persons have a substantive due process right to "reasonable care

25  and safety, reasonably nonrestrictive confinement conditions, and such training as may be

26  requred by these interests").  Second, the right against deliberate indifference to a serious

27  medical need has been clearly established.  See Clement v. Gomez, 298 F.3d 898, 906 (9th Cir.

28

1   2002).  Finally, the right against retaliation is well established.  See Soranno's Gasco, 874 F.2d

2   at 1314-1315.  Defendants do not explain why their actions were reasonable.  Thus, viewing the

3   evidence in a light most favorable to plaintiff, defendants have not met their burden in

4   establishing that their actions were reasonable, and they are not entitled to qualified immunity.

5   IV.    Pro Se Prisoner Settlement Program

6        Prior to setting this matter for trial and appointing pro bono counsel to represent plaintiff

7   for that purpose, the court finds good cause to refer this matter to Judge Nandor Vadas pursuant

8   to the Pro Se Prisoner Settlement Program for settlement proceedings on the surviving claims set

9   forth above.  The proceedings will consist of one or more conferences as determined by Judge

10  Vadas.  The conferences shall be conducted with defendants, or the representative for

11  defendants, attending by videoconferencing if they so choose.  If these settlement proceedings do

12  not resolve this matter, the court will then set this matter for trial and consider a renewed motion

13  from plaintiff for appointment of counsel.

14                                      **CONCLUSION**

15       1.    Defendants' motion for summary judgment is DENIED in part and GRANTED in

16  part.  The motion is granted as to plaintiff's equal protection claim.  Plaintiff has set forth

17  genuine triable issues against all defendants regarding his due process claim; against Yasaie and

18  Kaur regarding his deliberate indifference claim; and against Yasaie, Thomas, and Weakley in

19  his retaliation claim.  Defendants Ott and Graziani are DISMISSED from plaintiff's deliberate

20  indifference and retaliation claims.

21       2.    Plaintiff's motion for appointment of counsel is DENIED without prejudice.

22       3.    The instant case is REFERRED to Judge Vadas pursuant to the Pro Se Prisoner

23  Settlement Program for settlement proceedings on the remaining claims in this action, as

24  described above.  The proceedings shall take place within **ninety (90) days** of the filing date of

25  this order, or as soon as is practicable.  Judge Vadas shall coordinate a time and date for a

26  settlement conference with all interested parties or their representatives and, within **ten (10)**

27  **days** after the conclusion of the settlement proceedings, file with the court a report regarding the

28

1  prisoner settlement proceedings.  If these settlement proceedings to do not resolve this matter,

2  plaintiff can file a renewed motion for appointment of counsel and the court will then set this

3  matter for trial.

4          4.      The clerk of the court shall mail a copy of the court file, including a copy of

5  this order, to Judge Vadas in Eureka, California.

6          5.      The instant case is STAYED pending the settlement conference proceedings.

7  This order terminates docket numbers 107 and 126.

8          IT IS SO ORDERED.

9  DATED:  _9/30/10_____

*Ronald M. Whyte*

10                                          RONALD M. WHYTE
                                            United States District Judge

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Order Granting in Part and Denying in Part Defendants' Motion for Summary Judgment; Referring to Pro Se
Prisoner Settlement Program
P:\PRO-SE\SJ.Rmw\CR.07\Ohaire002msjref.wpd        18